

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

RCH/NJM
F. #2019R00206

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 11, 2021

<u>By Email</u>

The Honorable Cheryl L. Pollak
United States Magistrate Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Heather Busch, et al.
     <u>Criminal Docket No. 21-254 (RPK)</u>

Dear Judge Pollak:

  The defendants in the above-referenced case are scheduled to appear before the Court later today, to be arraigned on an indictment. In the indictment, Robert Smith ("Smith") is charged with: (i) four counts of using interstate facilities to commit bribery, in violation of 18 U.S.C. §§ 1952(a)(3)(A); (ii) two counts of conspiracy to violate the Travel Act, in violation of 18 U.S.C. § 371; (iii) one count of attempted distribution of at least one kilogram of heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A)(i); and (iv) one count of possessing a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Robert Hassett ("Hassett") is charged with: (i) two counts of using interstate facilities to commit bribery; and (ii) one count of conspiracy to violate the Travel Act. Heather Busch is charged with: (i) one count of conspiracy to violate the Travel Act; and (ii) using interstate facilities to commit bribery. As set discussed more fully herein, the Court should enter a permanent order of detention as to Smith, because he poses a significant danger to the community and a risk of flight. Because Hassett and Busch pose risks of flight, the Court should release each of them on a substantial bond secured by suretors or real property.

I. <u>Background</u>

  Smith is a retired New York City Police Department ("NYPD") officer, who was previously assigned to the 105th Precinct in Queens, New York. Hassett and Busch are current NYPD officers assigned to the 105th Precinct. As alleged in the indictment, Smith engaged in a series of corrupt criminal schemes for years while employed by the NYPD and

continuing after he retired from the NYPD, including, at times, in concert with Hassett and Busch.

Specifically, beginning in approximately September 2016, Smith, working with Hassett, engaged in a corrupt scheme whereby, after responding as NYPD officers to automobile accidents, they would steer damaged vehicles to a tow trucking and automobile repair business (the "Business") operated by another individual ("Individual No. 1") in lieu of administering the NYPD's Directed Accident Response Program ("DARP") (the "Tow Truck Scheme"). In exchange for their participation in the Tow Truck Scheme, Smith and Hassett received thousands of dollars in cash bribe payments from Individual No. 1. Smith and Hassett continued to participate in the Tow Truck Scheme until at least June 2017, when Smith and Hassett temporarily suspended their participation. In November 2019, Smith resumed his participation in the Tow Truck Scheme, continuing to steer vehicles damaged in automobile accidents to the Business in exchange for cash bribe payments. Following his retirement from the NYPD in March 2020, Smith recruited Busch to participate in the Tow Truck Scheme. After Smith's introduction, Busch began steering vehicles damaged in automobile accidents to the Business in exchange for cash bribe payments as part of the Tow Truck Scheme.

In addition, beginning in approximately January 2020, Smith and Hassett agreed to participate in a second corrupt scheme to obtain the names and identifying information of recent automobile accident victims from NYPD databases and provide that information to Individual No. 1 in exchange for bribe payments (the "Victim Database Scheme"). Smith and Hassett understood that, after receiving this information, Individual No. 1 would sell that information to physical therapy businesses and personal injury attorneys who would then seek to solicit the automobile accident victims as customers. In total, between approximately January 2020 and March 2020, Smith and Hassett accessed NYPD databases in contravention of NYPD regulations, obtained the names and identifying information of more than 100 victims of recent automobile accidents and provide that information to Individual No. 1. In exchange for this information, Smith and Hassett received more than thousands of dollars in cash bribe payments.

Finally, beginning in approximately January 2020, Smith sought an opportunity to assist a criminal organization by transporting illegal narcotics while armed in exchange for payment, upon his retirement from the NYPD (the "Armed Drug Trafficking Scheme"). On numerous occasions, Smith discussed his desire to have Individual No. 1 introduce Smith to drug traffickers, so that Smith could participate in the Armed Drug Trafficking Scheme. In approximately June 2020, Smith met with two individuals that Smith understood to be drug traffickers and discussed his desire to participate in the Armed Drug Trafficking Scheme. Smith represented that he could carry a firearm and retired NYPD identification during his transportation of illegal narcotics and discussed the payments he would receive. In approximately July 2020, Smith met with an individual that Smith understood to be a drug trafficker and accepted a bag containing what Smith understood to be a kilogram of heroin. At that meeting, Smith advised that he had a firearm, showing it to the individual. Thereafter, Smith transported the bag from Uniondale, New York to Queens, New York, where he

delivered it to another individual who Smith understood to be a drug trafficker. Thereafter, Smith received $1,200 in cash for his assistance.

II.     Legal Standard

      A.     The Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141, et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. See 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, (2) the history and characteristics of the defendant, (3) the seriousness of the danger posed by the defendant's release and (4) the evidence of the defendant's guilt. 18 U.S.C. § 3142(g). Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same). As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross examination. Most proceed on proffers. See United States v. LaFontaine, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

      B.     Presumption Cases

Under the Bail Reform Act, when there is probable cause to believe that a defendant committed a drug trafficking offense for which a maximum term of imprisonment of ten years or more is prescribed or a violation of 18 U.S.C. § 924(c), "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community." 18 U.S.C. §§ 3142(e)(3)(A),

3

3142(e)(3)(B). The requisite probable cause may be established by an indictment, such that there is no need for the judge to make an independent probable cause determination. United States v. Contreras, 776 F.2d 51, 55 (2d Cir. 1985). If a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that contradicts notions of flight risk or dangerousness." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). A bail package sufficient to overcome a presumption of flight may not be enough to overcome a presumption of dangerousness. United States v. Rodriguez, 950 F.2d 85, 89 (2d Cir. 1991). Regardless of whether the presumption applies, the government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. Mercedes, 254 F.3d at 436.

### C. Elaborate Bail Packages Are Insufficient to Protect the Community Against Dangerous Defendants

The Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants. See Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail package secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million bail package secured with real property, home detention, restricted visitation and telephone calls, and electronic monitoring); United States v. Colombo, 777 F.2d 96, 97, 100 (2d Cir. 1985) (rejecting $500,000 bail package secured by real property).

The Second Circuit has viewed home detention and electronic monitoring as insufficient to protect the community against dangerous individuals. In United States v. Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions.

4 F.3d 1039, 1048-49 (2d Cir. 1993) (citations and internal quotations omitted); see also Orena, 986 F.2d at 632 ("[E]lectronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted). Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring. See, e.g., United States v. Cantarella, 2002 WL 31946862, at *3-4 (E.D.N.Y. 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gershon, J.) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility[.]"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail

Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

III.  Smith Constitutes a Danger to the Community and Should Be Detained

All four statutory factors strongly support the entry of a permanent order of detention against Smith, and Smith cannot overcome the presumption that he should be detained.

A.  Nature and Circumstances of the Crimes Charged

The nature and circumstances of the crimes charged clearly demonstrate that Smith poses a danger to the community.  Smith is charged with acting as a corrupt NYPD officer for years, accepting thousands of dollars in bribes in exchange for official actions.  As outlined in the indictment, Smith engaged in multiple criminal schemes while employed by the NYPD, including the Tow Truck Scheme and the Victim Database Scheme.  Given his position as an NYPD officer, his actions constitute an especially jarring disregard for public safety, dereliction of his duty, and affront to the rule of law.  Moreover, following his retirement from the NYPD, Smith has engaged in even more serious criminal conduct, including agreeing to transport a kilogram of heroin while armed with a firearm.

Because Smith is charged with committing a drug trafficking offense for which a maximum term of imprisonment of ten years or more is prescribed and with a violation of 18 U.S.C. § 924(c), he is presumed to pose both a danger to the community and a risk of flight, and that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community."  18 U.S.C. §§ 3142(e)(3)(A), 3142(e)(3)(B).  The defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight."  United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).  Even if the defendant were to meet his burden of production, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court."  Id.  The defendant cannot rebut the presumption that he poses a danger to the community.  The very nature of the charged crimes constitutes persuasive and clear and convincing evidence in favor of the defendant's detention.

B.  History and Characteristics of Smith

The history and characteristics of Smith also support pretrial detention.  As alleged in the indictment, Smith engaged in corrupt criminal conduct as a NYPD officer for years, participating in a multitude of criminal schemes, including the Tow Truck Scheme, the Victim Database Scheme, and most recently the Armed Drug Trafficking Scheme.  In particular, Smith's efforts to assist criminal organizations by agreeing to transport a kilogram of heroin while armed with a firearm reflects an alarming escalation in the seriousness of his criminal conduct now that he has retired from the NYPD.  Moreover, evidence gathered during

the course of this investigation, including video recordings, audio recordings and text message communications, reveals that Smith has participated in other uncharged criminal conduct, further evidence of his utter disregard for the law, his duty as an NYPD officer, and the safety of the public. By way of example, in one set of text messages, Smith and another individual discussed how Smith, as an NYPD officer, had engaged in robberies and shakedowns, or "shakes" as Smith described them, of individuals and businesses for bribe payments. On one occasion, Smith wrote, "Bro I robbed everyone." In another set of text messages, Smith, following his retirement from the NYPD, stated that he would brandish his firearm in front of Black individuals to terrorize them: "Bro I point my gun out the window now at nighers [sic] and watch their reaction and drive way. Hilarious."[1] Lest Smith's former ties to law enforcement be used to somehow mitigate the risks attendant to his release, his views on the NYPD were expressed unmistakably to another former officer when Smith wrote, "I want to see mass nypd suicide and deaths. Those fake bitches." Smith's troubling history and escalating pattern of criminal conduct, sometimes involving his use of a firearm, clearly supports pretrial detention.

        C.        <u>Seriousness of the Danger Posed by the Defendant's Release</u>

Smith poses a clear danger to the community if released. For years, he acted as a corrupt NYPD officer, taking official actions in exchange for thousands of dollars in bribes. Following his retirement, he sought to assist criminal organizations in armed drug trafficking and, by his own admission, has brandished his firearm to terrorize members of the community.

Moreover, evidence gathered during the course of this investigation also clearly reflects that Smith has threatened to harm individuals, if he came to believe that they were assisting federal law enforcement authorities. Specifically, the government has obtained video and audio recordings in which Smith is captured stating that he would "get" Individual No. 1, if he ever learned that Individual No. 1 was "wearing a wire." In another recorded meeting, Smith stated to Individual No. 1: "You better not be a fucking rat." In a third recorded meeting, Smith stated to Individual No. 1 that he was glad that he knew where Individual No. 1 lived so that, if Individual No. 1 was a "rat," Smith could "shoot" him.

Based on the nature of Smith's charged criminal conduct, his admission to extorting individuals and businesses as a NYPD officer, his discussions of brandishing a firearm to terrorize members of the community, and his repeated threats to harm Individual No. 1, Smith constitutes a clear danger to the community and must be detained pending trial. There is a significant risk that the defendant, if released, would seek to intimidate or hurt individuals he perceived to be potential witnesses in order to secure his freedom or to prevent individuals from testifying against him. Moreover, the defendant's willingness to use a firearm

---

[1] Smith's unabashedly racist and hate-filled language in his communications included regular references to Black individuals as "n******s" and numerous references to the Ku Klux Klan, including one—just after his retirement—in which he wrote, "Now the real [S]mith will shine. I even shaved my head. Klan."

to commit the charged crimes and other uncharged criminal conduct reinforces the danger he poses to the wider community at large.

    D.    <u>Evidence of Smith's Guilt</u>

The evidence of Smith's guilt as to the charged crimes is overwhelming and clearly favors detention. As part of its investigation, the government has obtained dozens of video recordings, audio recordings, and text message communications capturing Smith's participation in the Tow Truck Scheme, the Victim Database Scheme, and the Armed Drug Trafficking Scheme. These recordings and communications clearly depict Smith accepting thousands of dollars in bribe payments, unlawfully steering numerous damaged vehicles, delivering unlawfully obtained names and identifying information of dozens of automobile accident victims, recruiting his co-conspirators, Hassett and Busch, to participate in the charged crimes, meeting with and acting in concert with Hassett and Busch, and transporting a kilogram of, what he believed to be, heroin while armed with a firearm.[2]

These video recordings, audio recordings, and text message communications also clearly capture Smith's criminal state of mind. On one of these recordings, for example, Smith referred to himself as "one of the most corrupt cops in the 105," referring to the 105th Precinct. Similarly, in a text message to another NYPD officer, Smith described himself as a "perp[] that got away." In another recording, Smith stated that, if he had not been an NYPD officer, he would have been "locked up so many times." In another text message, Smith relayed that, while recruiting Busch to participate in the Tow Truck Scheme, he had assured her that he was not a "rat[.]" Further, after Smith agreed to transport illegal drugs for organized crime, Smith sought confirmation, during a recorded meeting, that the organization did not "have no rats or nothing." These video recordings and audio recordings also capture numerous instances in which Smith sought to determine whether he was being investigated by federal law enforcement authorities for his past participation in the Tow Truck Scheme, while he continued to engage in the charged crimes.

IV.    <u>Smith Constitutes a Significant Risk of Flight</u>

In addition to the facts set forth above, Smith constitutes a flight risk due to the lengthy prison term he faces. <u>See, e.g.</u>, <u>United States v. English</u>, 629 F.3d 311, 321-22 (2d

---

[2] The evidence of Hassett's and Busch's guilt is equally overwhelming and weighs heavily in favor of the Court setting a substantial bond secured by suretors or real property. Video recordings, audio recordings, and text message communications capture Hassett repeatedly engaging the Victim Database Scheme, including depositing documents containing the names and identifying information of victims of recent automobile accidents into a mailbox, retrieving bribe payments and communicating with co-conspirators such as Smith. Similarly, video recordings, audio recordings, and text message communications capture Busch engaging in the Tow Truck Scheme on numerous occasions, including unlawfully steering damaged vehicles at the scenes of automobile accidents, retrieving bribe payments and communicating with co-conspirators such as Smith.

Cir. 2011) (affirming detention in part because the defendant faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x. 470, 471 (2d Cir. 2003) (summary order) ("the presumption regarding flight risk has changed because [the defendant] now faces a ten-year mandatory minimum sentence"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight). Even electronic surveillance and home confinement are not sufficient to guard against flight. See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks omitted).

On the current charges, Smith faces a mandatory minimum sentence of fifteen years of imprisonment and a maximum sentence of life imprisonment. With regard to the U.S. Sentencing Guidelines (the "Guidelines"), Smith faces, in addition to a consecutive five-year mandatory minimum sentence for the firearms offense, a consecutive Guidelines range of approximately 120 to 121 months of imprisonment on the drug trafficking and bribery charges.[3] Smith thus faces significant sentencing exposure that provides a powerful incentive to flee. Moreover, both Hassett and Busch face substantial terms of imprisonment. The government estimates that Hassett's Guidelines range of imprisonment is approximately 33 to 41 months, while Busch's Guidelines range of imprisonment is approximately 21 to 27 months.

V.   Conclusion

For the reasons set forth above, the government respectfully requests that Smith be permanently detained pending trial, as there are no conditions or combination of conditions that will assure the safety of the community or his return to court. Further, because both Hassett and Busch pose a risk of flight, the government respectfully requests that the Court release them on significant bonds secured by suretors or real property.

    Respectfully submitted,

    MARK J. LESKO  
    Acting United States Attorney

By:    /s/ Ryan C. Harris  
    Ryan C. Harris  
    Nicholas J. Moscow  
    Assistant U.S. Attorneys  
    (718) 254-7000

cc: Clerk of Court (by Email)

---

[3] All Guidelines calculations in this letter constitute estimates that are subject to change.