UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|                            |   |                  |
|----------------------------|---|------------------|
| United States of America,  | : |                  |
|                            | : |                  |
|    - v -    | : | 21-CR-254 (RPK)  |
|                            | : |                  |
| Robert Smith,              | : |                  |
|                            | : |                  |
|    Defendant. | : |                |
|                            | : |                  |

## SUBMISSION IN AID OF SENTENCING ON BEHALF OF ROBERT SMITH

Andrew J. Frisch
The Law Offices of Andrew J. Frisch, PLLC
40 Fulton Street, 17th Floor
New York, New York 10038
(212) 285-8000
*afrisch@andrewfrisch.com*

*Attorney for Robert Smith*

Introduction

While on patrol a few years ago, Robert Smith saw a house on fire. Rather than await the Fire Department, then-Officer Smith ran into the building to save lives. Mr. Smith put himself squarely in harm's way and risked his well-being to make a difference. On that occasion, Mr. Smith was not completely successful: an infant had already burned to death.

With this submission, Mr. Smith again puts himself in harm's way and risks his well-being to make a difference. After Mr. Smith's arrest in this case, he proffered twice with the government, admitting his crimes and disclosing wrongdoing of others within the New York City Police Department, including longstanding colleagues and friends. If Mr. Smith asked to seal disclosure of his efforts to cooperate, the government would likely not object, and the Court would likely honor the request. Mr. Smith, however, has elected not to play it safe for the same reason that he declined to await the Fire Department when he saw a house on fire: policing in the United States has been an intractable problem for decades, and we can no longer wait for Congress or any federal or state executive to come to the rescue. *See, e.g., "Congress has given up on police reform. Both sides agree they missed the moment: Lawmakers had been on the cusp of the deal but couldn't get it across the finish line after political pressures took over,"* nbcnews.com, Sept. 25, 2021.[1]

The time to make a difference is now.

Mr. Smith knows that he should be imprisoned for his crimes. While there are circumstances of Mr. Smith's conduct that may be aggravating or mitigating when compared to

---

[1] Available at *https://www.nbcnews.com/politics/congress/congress-has-given-police-reform-republicans-democrats-agree-they-missed-n1280090*

2

others who have committed similar crimes, the goals of sentencing require his separation from the community to punish and deter.  As a police officer, Mr. Smith accepted bribes from a tow-truck driver.  That tow-truck driver was then arrested for unrelated crimes and cooperated with the government to make a new case against Mr. Smith for transport of a controlled substance after he retired from the Police Department.  Mr. Smith in this submission attempts to provide insight into his "history and characteristics" within the meaning of Title 18, United States Code, Section 3553(a)(1), but he proffers no excuse:  Mr. Smith committed these crimes and knew better.

This Court has discretion to fashion a sentence that imposes imprisonment to punish Mr. Smith and also rewards his attempted cooperation, thereby publicly encouraging similarly-situated others to cross the blue line.  The government has promised to file a letter pursuant to *United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006), confirming Mr. Smith's attempted cooperation.  The government appears to have deemed Mr. Smith's efforts to be sufficiently genuine to warrant disposition of this case without an otherwise-applicable mandatory minimum, providing the Court with the broadest possible discretion to fashion a sentence that punishes Mr. Smith for past conduct and encourages others to help remedy chronic problems with policing.

Whatever cynics may say about Mr. Smith, he is putting himself in harm's way just as when he entered a house on fire.  This submission assures that Mr. Smith will be entering the Bureau of Prisons with two targets on his head:  he's a cop, and he's a rat.  Mr. Smith believes that he most effectively resurrects his value in the eyes of his sixteen year-old son and eleven year-old daughter, his wife, and his extended family and friends by using this moment to

3

recapture his motivation of more than twenty years ago when he joined the New York City Police Department: to make a difference by putting the interests of the community ahead of his own.

This District has a proud history of staring down cynics and using judicial power to make real differences for the community. In *Blocker v. Board of Education of Manhasset*, 226 F. Supp. 208 (E.D.N.Y. 1964), a Judge in this District ruled that a non-transfer policy restricting African-American children to one public school constituted unconstitutional state-imposed segregation. In *Berkman v. City of New York*, 536 F. Supp. 177 (E.D.N.Y. 1982), a Judge in this District ruled that a test for employment by the New York City Fire Department unlawfully discriminated against women. These rulings and many others like them [*see "The United States District Court for the Eastern District of New York: A Retrospective (1990-2014)"[2]*] resolved disputes between particular litigants. But they also significantly added to momentum toward solving ostensibly intractable problems. In these cases and others, Judges in this District filled voids where Congress and federal and state executives had either failed to act or had acted inadequately or ineffectively.

This Court should seize on the opportunity presented by this moment to fashion a sentence that punishes Mr. Smith for the past and encourages change for the future.

A. *Mr. Smith's actions in attempting to cooperate underscore the sincerity of his words*

Most defendants apologize at sentencing for their crimes and express regret and

---

[2] Available at *https://img.nyed.uscourts.gov/files/forms/EDNY_Retrospective%20_1990-2014.pdf*. See also *"A History of the United States Court for the Eastern District of New York to Commemorate and to Celebrate a Centennium 1865-1965,"* available at *https://img.nyed.uscourts.gov/files/local_rules/EDNY%20History%201865-1965%20Centennium.pdf*.

4

remorse. Few merge words with actions as here. This prosecution and its accompanying public recounting of things Mr. Smith did and said jarred him. It forced Mr. Smith to stare into a mirror and see reflections of his failings in the light of his significant strengths as a dad, a husband, and a well-intentioned member of the community. Since Mr. Smith's arrest, he has worked hard to reconcile with himself so he can live up to the expectations of his family, and more, his now-deceased mother. Mr. Smith now knows that living a virtuous life requires daily vigilance:

> I never felt such shame in my life as when this case forced me to confront what I had done and said. I wish it had not taken a prosecution to do it, but it is important that it happened. To see and talk to my son and daughter broke my heart. I have thought of my deceased mother and how ashamed she would have been of me. I have heard her voice in my head saying, "Robby what did you do."
>
> I have always been the one to take care of my family's problems and this is something I did to hurt them. The shame and hurt I have caused them are irreparable. What kind of image and role model am I to my 16 year-old son? To my 11 year-old daughter? What kind of husband am I to my wife?

Exhibit A at 1.

In Mr. Smith's letter to the Court, he explains that his motivation to be a police officer was to help people. During Mr. Smith's twenty years as an officer, he helped deliver babies, comfort the elderly, and reunite lost children with their parents, each of whom he saw as his own. Mr. Smith loves dogs and routinely took strays to a veterinarian with the hope of finding a microchip rather than bringing them to a pound. Exhibit A at 2.

On September 11, 2001, Mr. Smith responded to the World Trade Center just after the second tower collapsed. He assisted the living and tried to find others: "To this day I can still hear their voices crying for help over my radio." For over a year thereafter, Mr.

Smith helped with the ongoing recovery, sifting through debris to recover body parts to help bring closure to families.  Exhibit A at 2.

Mr. Smith's proffers with the government were especially difficult because he disclosed wrongdoing of colleagues and friends, but also because it was part of his own efforts to reconcile his past with his future:

> I am guilty of the crimes I am being charged with and have no excuses for what I have done and take full responsibility.  The meaning of this letter is to let you know of the good things I have done in my life.  I know I have to do prison time for the crimes that I am guilty of.  I want to come home while my kids are still young and I want them to learn from my mistakes.  From the day I had to confront myself in this case, I wake up everyday trying as hard as I can to be the best example.

Exhibit A at 2.

B.  *Context provided by Mr. Smith's family and friends*

Letters in Mr. Smith's support give context to his efforts to reconcile virtue with vice.  They shed light on Mr. Smith's expectations for himself and why he has elected not to ask that his efforts to cooperate be sealed.

Christine Smith-Hoy, Mr. Smith's sister, recounts his instinctive effort to run into a house on fire to save lives, risking his own safety:

> Robby worked in Queens and one day was driving his police car and saw an apartment building ablaze.  No fire engines were on scene yet and Robby, who could have chosen to continue riding in his vehicle, didn't.  He jumped out without hesitation, without protective gear to protect himself from the fire and smoke, and ran into the fiery building.  Even though he was met by civilians outside the building who cursed his uniform and who were not in favor of the police force, this contentious, clashing environment (cop vs. public) did not deter him from going into that building.  Robby went through each and every floor, calling out to see if anyone could be rescued.  On the second floor he spotted a baby lying on the bed, and he immediately darted towards that infant and ran full force out the front door.  The child, however, was not breathing and was not able to be resuscitated.  The baby was burned alive.  Robby ran into that building to save lives

because that is who he is. He saved lives and will try with all his heart and soul to give life to those that his presence reaches, even at the expense of his own life.

Exhibit C at 4.

Mr. Smith's instinct to help others defines his life at home. His family and friends attest to his devotion to relatives in need. Paula Smith, Mr. Smith's wife, remembers his doting on her mother (Mr. Smith's mother-in-law) when she became ill:

> When my mom was diagnosed with terminal lung cancer Rob took time to take her to and from her treatments; she told him that having him there with her made her feel calm and safe. He helped her maintain her house while she was sick . . . . When she passed away three months after her diagnosis, he took it very hard.

Exhibit B.

Christine Smith-Hoy recalls how her brother offered to sacrifice one of his lungs for their mother:

> [W]e had a beloved mom who passed away four years ago, and who is still severely missed. We are a close-knit family who was raised by a single mom, Ann. Ann was diagnosed with end stage lung disease on 2015 and given three years to live. During these three years, she required daily oxygen use. Her mobility was severely limited. Robby wanted [our] mom to live a better quality life and offered and begged her to take one of his lungs so she could live longer. Robby, a good and thoughtful soul, wanted to give my mom the gift of an extended life. My mom refused this gift and strongly stated that she wanted Robby to live his own beautiful life with his own family, with both lungs.

Mr. Smith's mom passed away, "but her beautiful gentle way lives through Robby." Exhibit C at 1. *See* Exhibit B (Letter of Paula Smith) ("Rob was very close to his mom and when she became sick he took care of her - while maintaining his demanding job as a police officer and taking care of us he would also take care of his mom. He would take her to and from her appointments; bring her dinner every night and just go there to sit with her and keep her company. When she passed away in 2018, he was truly devastated.").

Mr. Smith likewise doted on his brother-in-law after a serious car accident: "My

husband Frank was in a severe car accident in which he suffered many physical and neurological handicaps . . . . Robby would sit near Frank for months and months, just to be there for Frank. Many nights I would see Robby sitting near Frank, comforting and consoling my husband, giving him hope with kind, inspiring words." Exhibit C at 3. *See* Letter of Joseph and Lisa Mastanduno, Exhibit F ("We know Rob to be a loving husband, devoted father of two children, and dedicated son. He took great care looking after his aging, single mother who lived close by and was included in every family activity").

Mr. Smith's interest in making a difference to the community flows from his defining attributes as a great dad and husband. As his wife explains, "[s]ince the day I met him he has been my protector and has been everyone's protector. His nature is to take care of the people he loves and cares about." Exhibit B. As Mr. Smith's sister explains,

> Robby cooks and cleans and irons. He has attended dance recitals, school plays and hockey games and tournaments, which bring him and his children closer together, making long-lasting memories and moments to be treasured forever. The Smith house is one that is peaceful and loving. If you were to walk into Robby's house today, you would be greeted by Lucky the dog, barking, and [the Smiths' daughter] twirling around on her toes, with her hands held high around her head, like a ballerina, smiling from cheek to cheek.

Exhibit C at 2.

As Mr. Smith's sixteen year-old son puts it, "My dad has taught me so much . . . . He taught me how to be kind and how to help our neighbors. He taught me that it is ok for a man to hug and to cry and he taught me how to take care of my mom and sister . . . My dad always makes sure I do the right thing." Exhibit D ("My dad is my best friend. He has always been there for me . . . . I missed my dad so much when he was working and always ran to him when he came home from work."). See Exhibit C at 3 ([The Smiths' son] "is a typical teenager who

works out at the gym or is hanging out with his family or friends. [He] excels in English language arts and enjoys reading social studies textbooks for fun. [He] is a public advocate for positive body image and fitness, and protects against bullying of all types"); Letter of Michelle Failla, Exhibit E ("Robert is the most devoted and loving husband to Paula and father to [his children] . . . [W]hen I watch him with them it just makes me smile as for all the love they all have for each other. His children look up to him and he is an excellent role model for them. His family is his world."); Letter of Luisa Rapaglia, Exhibit G ([The children] "are thoughtful, respectful and kind like their father"); Exhibit C at 2 ("This past summer Robby and his [then] 10 year-old daughter . . . sat together many days painting rocks that [she had] gathered. Giggles and laughter would erupt with these shared, beautiful moments").

        Mr. Smith's spirit animates his love of dogs and his efforts to rescue strays. "[H]e would pick up the stray dogs and put them in his patrol car and would text me a picture and say, what about this one? Can I bring him home?" Exhibit B. "Robby loves animals and has rescued countless animals over the years, When he saw a lost dog, even when he was on the job, he would scoop it up, take it to a vet to scan its collar and then return the dog to its rightful owner . . . [Or] he would ask friends and colleagues to provide loving homes for these lost animals." Exhibit C at 1-2.

        Mr. Smith is known among neighbors and family as always ready to help. "Rob is someone you can count on when in need, If someone is having car trouble, one of the kids on the block needs air in their bike's tires or a stubborn shrub need to be pulled, he is there to help with a smile." Letter of Luisa Rapaglia, Exhibit G. "Robby has also done gardening projects for more than a decade for his next door neighbors, because they are older and not able

9

to do it on their own. Many neighbors love and adore Robby because he is a generous and kind human being. He is an easy going and fun loving person who will help those in need without ever being asked to do so." Exhibit C at 2. Letter of Dawn M. Giannola Munoz, Exhibit H ("Robert is a caring and selfless man who spends his last available minute helping those he loves . . . . Somehow, within his busy life, Robert also found the time to help me . . . . On his days off, Robert would come over to help me paint or fix things around the house . . . .He is the type of man who will always find a time to help someone change a flat or change a battery or fix a broken sprinkler head. He is a man you would want as a next-door neighbor, a colleague or a friend.")

The words of Mr. Smith's son speak to a sentiment held by many: "I love my dad very much. He is my hero." Exhibit D. *See* Exhibit B (Mrs. Smith: "He is my best friend and my heart literally hurts thinking about spending time away from him."); Exhibit C ("Society itself will be void of Robby's kindness, goodness, and good deeds for the amount of time he serves away from us all").


C.	*Mr. Smith's efforts to improve policing through discussion of "moral injury"*

Ostensibly counter-intuitive concepts like post-traumatic stress syndrome, co-dependency, and similar psychologically-based phenomena can take time to gain acceptance and be understood. Moral injury is such a developing concept. *See "Compromised Conscience: A Scoping Review of Moral Injury Among Firefighters, Paramedics, and Police Officers,"* Frontiers in Psychology, March 2021, Vol. 12 ("Compromised Conscience") (Exhibit I). Moral injury is defined, in substance, as the spiritual, cognitive, emotional or existential consequences

to police officers (and other public safety personnel) whose daily work can create complex moral dilemmas and conflicts between express and implicit codes of conduct and applicable standards of practice and law. Compromised Conscience at 2-8, 10.

It is sometimes difficult to square an offender's longstanding respect in the community with commission of a crime and sometimes even more difficult to overcome the community's resistance to try: the social contract requires consequences for its breach, more so when the actor was entrusted with upholding its terms. Mr. Smith discusses moral injury here not to excuse past violation of the social contract, but to contribute to improved policing.

Studies of public safety personnel, including New York City police officers, show that opportunity to help others is a paramount motivation of recruits to become officers, while power and authority are irrelevant. Compromised Conscience at 4. After recruits become officers, however, "they navigate between being agents of the government enforcing laws, acting as social peacekeepers, and mediating of communal welfare, [serving] a complex position in society" [*id.* at 4], which creates conflicts that can cause moral injury:

> Police officers are confronted daily with the task of having to make decisions on how to act, often quickly, to resolve criminal incidents, perhaps with the use of physical or lethal force, and this can cause a clash between legislation and morality or the personal and professional. Police actions are intended to protect good through elimination of evil, which is arguably a futile task. As such, in many situations police officers face an inherent ambiguity. Officers must make rapid decisions on the credibility of both victims and complainants by weeding through different accounts of an event quickly, decisively, and hopefully fairly. Officers may need to act against at least one person's interest in most situations and potentially use physical force to accomplish their task. Intuitively the desire to help clashes with the necessity of harm. Policing is one of the few circumstances, next to military work, where use of force is a necessary and accepted tool that increases moral complexity.

Id. at 8 (citations omitted).

A contributor to moral injury is "organizational betrayal," where officers perceive an administrative hierarchy as insufficiently understanding and supportive of the challenges of daily policing, or worse, summarily punishing them for the consequences of the moral ambiguity attendant the rapid-fire judgment calls they are required to make:

> Broadly defined, organizational betrayal is a description of individual experiences of violations of trust and dependency perpetrated against any member of an institution, or when an institution causes harm to an individual who trusts or depends upon that institution . . . .
>
> [M]ost often, police officers stated that reactions to these events elicited feelings of anger followed by feelings of unappreciation, frustration, and disappointment. As a result of these experienced and associated feelings, officers became more skeptical of the organization and they perceived that the organization did not support them.

Id. at 9. Officers have also "experienced struggles with spiritual erosion (i.e., loss of relationship with a higher power or engagement in spiritual practices), negative changes in worldviews (i.e., bitterness, cynicism, jadedness), and a loss of sense of meaning. Similarly, [a study] noted that police officers experienced pronounced spiritual pain and distress resulting in disappointment, disillusionment, loss of self, meaninglessness, desacralization, alienation, hopelessness, and existential questioning." *Id.* The capacity of officers to meet the demands of their work is further complicated by citizen complaints, media attention, and internal and external investigations. *Id.* at 10.

As part of Mr. Smith's efforts to better understand himself and his way forward, he has been evaluated by Jeremy H. Colley, M.D., a forensic psychiatrist certified by the American Board of Psychiatry and Neurology. A graduate of the Columbia University College of Physicians and Surgeons, Dr. Colley has studied post traumatic stress disorder among

12

Vietnam-era combat veterans, worked in prisons and jails in California and New York, and observed moral injury firsthand.  *See* Exhibit J (Dr. Colley's *curriculum vitae*).

Dr. Colley concluded that Mr. Smith's "description of betrayal, anger, and lack of meaning in his work is clearly consistent with moral injury."  Exhibit K at 6.  Mr. Smith explained to Dr. Colley that he had become substantially disillusioned and calloused from his work, felt betrayed by his command, and caught between competing and conflicting duties and demands.  Mr. Smith recounted an officer who was suspended as unfit for duty after he broke down in tears upon sifting through debris of the World Trade Center for body parts.  Mr. Smith's resentment grew after his command denied his requests for time off after his grandmother died not long after September 11, 2001, when he had himself been helping at Ground Zero.  Mr. Smith came to feel "defeated," saw his work as "meaningless" and "useless" and his superiors as indifferent.  Exhibit K at 1-2, 4-5.  Dr. Colley explains that, if moral injury is not addressed, "it can become toxic and cause energetic, compassionate, kind and generous people committed to public service to become withdrawn, apathetic, cynical, and, at times, act out these feelings with aggression, violence, and unethical and illegal behaviors, ironically perpetuating the moral injury they have suffered via exposing others through their own actions."  Exhibit K at 3.

Mr. Smith joined the police force when he was in his early twenties and remained for twenty years until virtually the day he was eligible to retire.  Only now is Mr. Smith able fully to process and truly attempt to understand his experience and his own moral injury.  Understanding moral injury is important in providing communities with better policing.  Mr. Smith's hope is that his experience can provide the Court with context and be a cautionary tale for others.

13

D. *The Court should seize the moment and impose a sentence that encourages police officers to cooperate with official investigations*

Mr. Smith's criminal conduct has features that are both aggravating and mitigating when compared to others who have committed similar crimes. His acceptance of bribes to bypass protocols for random assignment of tow trucks and associated conduct is limited in scope, but undermines the community's trust in police officers. A sentence of imprisonment is necessary to vindicate the community's expectation that agents of law enforcement are themselves not above the law.

Mr. Smith's post-retirement transport of a controlled substance implicates the community's confidence in law enforcement in a different way. It seems unlikely that Mr. Smith would have transported what he believed was a kilogram of heroin but for the government's use of the tow truck driver to make a case against him. Mr. Smith readily acknowledges his interest in finding post-retirement work through the tow truck driver, whom he believed had criminal connections. Mr. Smith knew that the driver could provide him an opportunity to supplement his post-retirement income through illicit means.

But it was not Mr. Smith's idea to transport a kilogram of heroin or carry a firearm to do so. The government's evidence shows that Mr. Smith's initial discussion with the government's agent about transport of marijuana morphed into heroin at the urging of the government. Likewise, it was not until late in the crime's planning that the government's agent said that his purported principal required Mr. Smith to carry the firearm that he had retained from his time as an officer. These facts make Mr. Smith no less guilty, but concern about the

14

community's confidence in law enforcement can be a double-edged sword. Mr. Smith was never a drug dealer, let alone an armed one, before law enforcement capitalized on his interest in post-retirement income by using its informant to provide him an opportunity to become one. *See "More Federal Agencies Are Using Undercover Operations,"* The New York Times, Nov. 15, 2014.[3] Nor had Mr. Smith ever discharged or otherwise misused his firearm in his twenty years as a police officer or ever used excessive force; he misused his firearm for the first time after his retirement and only at the government's invitation through its agent. It speaks to Mr. Smith's history and characteristics that his response to this case was unequivocally to accept responsibility for what he did, begin the process of understanding the most constructive way forward, and proffer with the government to admit his crimes and disclose information about others.

If this Court sentences Mr. Smith within the applicable range under the Sentencing Guidelines or close to it, anyone paying attention to this case will conclude that a corrupt cop got what he deserved. The circumstances of this case present an opportunity that favors a more calibrated approach. The community's efforts at better policing are too often stymied by officers more interested in protecting each other than the public they serve. We cannot wait for some equivalent of the Fire Department to rush to the rescue. The government's disposition of the charges in this case without a mandatory minimum and its letter pursuant to *Fernandez* empower this Court to make a difference now.

---

[3] Available at *https://www.nytimes.com/2014/11/16/us/more-federal-agencies-are-using-undercover-operations.html*

E.  *Mr. Smith has agreed fully to pay his forfeiture*

When the government executed a search warrant of Mr. Smith's home, they recovered cash, mostly constituting an *inter vivos* gift from Mr. Smith's long-estranged father. Mr. Smith is in the process of providing corroboration of the source of the cash. Mr. Smith has agreed to pay his full forfeiture of $20,000 representing the total of his ill-gotten gain out of that cash.

F.  *Objections to the Presentence Report*

Mr. Smith has two objections to the Presentence Report.

***First***, the Probation Department's Addendum modifies its Report to include a four-level upward adjustment under U.S.S.G. §2C1.1(b)(3) for offenses involving a public official in a high-level or sensitive position. With the adjustment, the Probation Department concludes that Mr. Smith's adjusted offense level is 30, corresponding to a range of imprisonment of 97 to 121 months. The Court should not apply the Probation Department's modification and should instead implement the government's calculation in its plea agreement with Mr. Smith, which estimates an adjusted offense level of 29, corresponding to a range of imprisonment of 87 to 108 months.

The government's plea agreement provides that "[t]he defendant stipulates" to the adjusted offense level of 29. This language has become a subject of a degree of contention within this District. According to federal defenders within the District, they often object to it because it requires the defendant to "stipulate" to a calculation, while relieving the government of any corollary obligation to itself abide by the purported stipulation even absent new evidence.

The provision thus represents an interpretation of the word "stipulate" that is either esoteric in the context of an agreement between parties or misleading. *See https://www.law.cornell.edu/wex/stipulation* (defining "stipulation" as "an agreement between the parties to a lawsuit").

According to federal defenders in the District, this provision is of relatively recent vintage. Requests that it be omitted from particular agreements have become ritual for at least one federal defender, and the government typically (if not always) omits it upon request. My understanding is that typical plea agreements in the Southern District of New York do not use the word "stipulate" as here, but treat a stipulation as binding on both parties, with the government retaining the right (indeed, the obligation) to answer any relevant questions from the sentencing judge about the underlying law or the facts.

Judge Dearie recently declined to apply a higher range calculated by the Probation Department than the government's calculation in the plea agreement:

> Judge Dearie: I don't -- I don't mean to trivialize it when I say much ado about nothing. The parties have an agreement. Obviously, the parties anticipated a certain calculation of the guidelines, advisory guidelines range. The Probation Department, with more information, to be fair, calculated a somewhat higher range; but I can assure you, gentlemen and madam, that however we resolve this I will abide by the parties' agreement. It would not impact my sentence one wit.

*United States v. Kendall Johnson*, 19-CR-284, Transcript of Sentencing at 4 (E.D.N.Y. April 29, 2021). Despite language in Mr. Smith's plea agreement that the government interprets as permitting its advocacy of the Probation Department's higher range absent new evidence, undersigned counsel cannot recall any case of his own or a colleague's during his eleven years as an Assistant United States Attorney in this District where the government advocated for a higher

17

range under the Guidelines than estimated in the plea agreement absent new evidence - - or where a judge relied on the higher range.

The ease with which the government apparently agrees to omit this language of purported stipulation upon request renders it a trap for the unwary and runs afoul of the government's obligations of transparency and fair dealing. The government's disposition of Mr. Smith's case without a mandatory minimum eliminates this case as the best vehicle to facilitate appellate review of the provision. If the United States Attorney does not eliminate or reword this provision on his own, it is likely that the Circuit will look unfavorably on it when raised by an appropriate case: the government's misleading use of the word "stipulate," and the readiness with which the government abandons the language upon request, makes this case more analogous to the gamesmanship in *United States v. Palladino*, 347 F.3d 29, 32-35 (2d Cir. 2003) (plea agreement "hopelessly tainted by the introduction of new evidence known to the Government at the time of the plea"), than the hurried mistake in *United States v. Habbas*, 527 F.3d 266, 269-72 (2d Cir. 2008) ("under the pressures of preparing a *Pimentel* estimate after the defendant indicated readiness to plead," [the government] simply neglected to notice the possible applicability of an enhancement), both discussed in *United States v. Wilson*, 920 F.3d 155, 162 (2d Cir. 2019) ("because plea bargains require defendants to waive fundamental constitutional rights, prosecutors are held to meticulous standards of performance . . . . [W]e construe plea agreements strictly against the government and do not hesitate to scrutinize the government's conduct to ensure that it comports with the highest standard of fairness.") (internal quotation marks and citations omitted). *See United States v. Mergen*, 764 F.3d 199, 208-09 (2d Cir. 2014) ("it is quite settled that courts construe plea agreements strictly against the Government. This is

<mark>18</mark>

done for a variety of reasons, including the fact that the Government is usually the party that drafts the agreement, and the fact that the Government ordinarily has certain awesome advantages in bargaining power . . . . Even if the plea agreement is ambiguous, we construe plea agreements strictly against the Government.") (citations and internal quotation marks omitted); *United States v. McCall*, 649 Fed. Appx. 114 (2d Cir. 2016) ("Not surprisingly, the government had no objection to the imposition of a 108-month sentence. In short, although prior to the sentencing proceedings the parties believed that the 108 months' term of imprisonment was based on a contemplated Guidelines range, when they discovered they were in error, the parties agreed at sentencing to maintain the agreed-upon term of incarceration.").

*Second*, the Probation Department (at PSR ¶ 104) opines that its calculation under the Sentencing Guidelines does not "adequately represent" Mr. Smith's conduct because grouping rules "cancelled out" the charge of bribery. In so opining, the Probation Department provides no discussion of whether or not a purported "cancelled out" crime is contrary to the intended purpose of grouping; no authority for its position; and no reference to the relevance of the government's decision to resolve this case without a mandatory minimum.

The starting point for the Court's consideration of Mr. Smith's sentence is the 87 to 108 months as calculated by the government in the plea agreement (or the 97 to 121 months calculated in the PSR's addendum). The Probation Department's concern about application of the grouping rules seems a relic of an earlier time when judges bemoaned a "fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense," especially, as here, where the range is driven by numerical quantity of a controlled substance (as with fraud loss) divorced from the qualitative reality of the facts.

19

*United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (Rakoff, J.). This Court should decline PSR Paragraph 104's invitation and strike it.

Dated: April 6, 2022

        Respectfully submitted,

        Andrew J. Frisch
        The Law Offices of Andrew J. Frisch, PLLC
        40 Fulton Street, 17th Floor
        New York, New York 10038
        (212) 285-8000
        *afrisch@andrewfrisch.com*

        *Attorney for Robert Smith*