

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

RCH/NJM
F. #2019R00206

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 13, 2022

**To be filed in redacted form**

By ECF

The Honorable Rachel P. Kovner
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Robert Smith
                  Criminal Docket No. 21-254 (RPK)

Dear Judge Kovner:

        The government respectfully submits this letter in advance of sentencing in the above-referenced case, scheduled for April 20, 2022, at 4:30 p.m. On October 6, 2021, the defendant Robert Smith pled guilty before this Court to: (a) one count of using instrumentalities of interstate commerce to engage in Bribery in the Third Degree and Bribe Receiving in the Third Degree, contrary to New York Penal Laws §§ 200.00 and 200.10, all in violation of 18 U.S.C. § 1952(a)(3)(A); and (b) one count of attempted distribution of heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). For the reasons set forth below, a significant incarceratory sentence is appropriate in this case.

        I.      <u>Background</u>

        The defendant was a New York City Police Department ("NYPD") officer assigned to the 105th Precinct in Queens, New York until his retirement on March 6, 2020. <u>See</u> Presentence Investigation Report, dated January 24, 2022 ("PSR") ¶ 6. While an NYPD officer in the 105th Precinct in Queens, New York, the defendant accepted approximately $20,000 in bribes for engaging in two corrupt schemes, as detailed below. Upon his retirement, the defendant further agreed to transport illegal drugs for a drug trafficking organization while armed with a gun.

Beginning in approximately September 2016, the defendant, working with then-NYPD Officer Robert Hassett, engaged in a corrupt scheme whereby, after responding as NYPD officers to automobile accidents, they would steer damaged vehicles to a specific tow trucking and automobile repair business (the "Business") operated by another individual ("Individual No. 1") in lieu of administering the NYPD's Directed Accident Response Program ("DARP") as required (the "Tow Truck Scheme"). PSR ¶ 8. In exchange for their participation in the Tow Truck Scheme, Smith and Hassett received thousands of dollars in cash bribe payments from Individual No. 1. Id. The defendant and Hassett temporarily suspended their participation in the Tow Truck Scheme, after Individual No. 1 was arrested. Id.

In November 2019, the defendant resumed his participation in the Tow Truck Scheme after reconnecting with Individual No. 1 and steered at least four vehicles damaged in automobile accidents to the Business in exchange for at least $4,000 in cash bribe payments in lieu of administering DARP as required. PSR ¶ 9. In approximately January 2020, the defendant discussed with Individual No. 1 his plan to recruit his co-defendant Heather Busch into the Tow Truck Scheme, as Smith planned to retire from the NYPD. Id. In March 2020, the defendant arranged for Busch to meet with Individual No. 1 and begin participating in the Tow Truck Scheme. PSR ¶ 10. Thereafter, Busch steered at least six vehicles to Individual No. 1 pursuant to the Tow Truck Scheme in exchange for approximately $5,000 in cash bribe payments; for his recruitment of Busch, the defendant received a bribe payment of $1,000. Id.

Around this same time, in January 2020, the defendant and his co-defendant Robert Hassett agreed to participate in a second corrupt scheme with Individual No. 1, whereby they would obtain the names and identifying information of recent automobile accident vehicles from NYPD databases and provide that information to Individual No. 1 in exchange for cash bribe payments, so that this information could then be sold to physical therapy businesses and personal injury attorneys (the "Victim Database Scheme"). PSR ¶ 11. After agreeing to participate, Hassett accessed NYPD databases and retrieved the names and identifying information of recent automobile accident victims on numerous occasions and arranged for the information to be delivered to Individual No. 1, either directly or through the defendant. PSR ¶ 12. In total, between January 2020 and March 2020, Hassett and the defendant provided Individual No. 1 with the names and identifying information of more than 100 recent automobile accident victims accessed through NYPD databases, in exchange for more than $7,000 in cash bribe payments. PSR ¶ 13. In total, by participating in the Tow Truck Scheme and the Victim Database Scheme, the defendant received at least $20,000 in cash bribe payments. PSR ¶ 14.

In addition, at this same time, the defendant was actively seeking opportunities to engage in other criminal conduct with Individual No. 1, who he understood to be involved in organized crime, upon the defendant's retirement from the NYPD in March 2020. PSR ¶ 15. Two months prior to his retirement, in January 2020, the defendant discussed his desire for Individual No. 1 to arrange for the defendant to transport illegal drugs in exchange for payment, once the defendant retired. Id. In February 2020, the defendant again met with Individual No. 1 and

2

discussed, among other things, the types of drugs the defendant might transport, the payments he might receive, and the logistics of transportation. PSR ¶ 16. The defendant also asked Individual No. 1 that the drug trafficking organization for whom he would be transporting illegal drugs did not "have no rats or nothing." Id. In March 2020, as the COVID-19 pandemic accelerated, the defendant expressed his impatience and continued desire for Individual No. 1 to arrange the defendant's introduction to the drug trafficking organization. The defendant reminded Individual No. 1 that the defendant had arranged for Busch to participate in the Tow Truck Scheme and thus the defendant had "lived up to [his] end of the deal putting you onto [Busch]. Now it's your turn." PSR ¶ 16.

In June 2020, the defendant agreed to meet with the two individuals who the defendant understood to be members of the drug trafficking organization but who in fact were undercover law enforcement officers. PSR ¶ 17. During this meeting, the defendant expressed his desire to work with the drug trafficking organization and bragged that he could carry a firearm and retired NYPD identification documents during his transportation of illegal drugs for the organization. Id. The defendant also discussed his expected payment of $1,000 in cash for the drug transportation. Id. Following the introduction, the defendant contacted Individual No. 1 and thanked him for arranging the introduction, stating that it was "exactly what I was looking for." Id.

In July 2020, the defendant met an undercover law enforcement who he believed to be a member of the drug trafficking organization and accepted a bag containing what he believed to be a kilogram of heroin. PSR ¶ 18. The defendant agreed to transport the purported heroin to another individual and confirmed that he was carrying a firearm. Id. After successfully transporting the purported heroin, the defendant received a payment of $1,200. Id.

II. Sentencing Guidelines Calculation

The government agrees with the Guidelines calculation of the total offense level as calculated in the First Addendum to the PSR, set forth again below:

Count One: Use of Interstate Facilities to Commit Bribery

| | |
|---|---|
| Base Offense Level<br>(U.S.S.G. §§ 2E1.2(a)(2), 2C1.1(a)(1)) | 14 |
| Offense Involved More Than One Bribe<br>(U.S.S.G. § 2C1.1(b)(1)) | +2 |
| More Than $15,000 in Bribes<br>(U.S.S.G. § 2B1.1(b)(1)(C)) | +4 |

| | |
|---|---:|
| Defendant Was a Public Official in a Sensitive Position<br>(U.S.S.G. § 2C1.1(b)(3)) | +4 |
| Organizational Role in the Offense<br>(U.S.S.G. § 3B1.1(c)) | +2 |
| Adjusted Offense Level (Subtotal): | <u>26</u> |

Count Eight: Attempted Distribution and Possession with Intent to Distribute Heroin

| | |
|---|---:|
| Base Offense Level<br>(U.S.S.G. §§ 2D1.1(a)(5), 2D1.1(c)(5)) | 30 |
| Possession of a Dangerous Weapon<br>(U.S.S.G. § 2D1.1(b)(1)) | +2 |
| Adjusted Offense Level (Subtotal): | <u>32</u> |
| Multiple Count Adjustment<br>(U.S.S.G. § 3D1.4) | +1 |
| Combined Adjusted Offense Level: | <u>33</u> |
| Acceptance of Responsibility<br>(U.S.S.G. § 3E1.1(a), (b)) | -3 |
| Total: | <u>30</u> |

Based on a Criminal History Category of I, a total adjusted offense level of 30 results in an advisory Guidelines range of 97 to 121 months of imprisonment. PSR First Add. ¶ 87.

In his sentencing submission, the defendant objects to the application of the four-point enhancement under Section 2C1.1(b)(3) of the Guidelines related to the fact that he held a sensitive position as an NYPD officer. The defendant does not appear to actually disagree that the enhancement applies. Indeed, it is clear based upon Application Note 4 to Section 2C1.1 that the enhancement does apply here. See U.S.S.G. § 2C1.1 App. Note 4 ("Examples of a public official who holds a sensitive position include . . . a law enforcement officer."). Rather, the defendant's complaint appears to principally be that the plea agreement, which he reviewed with counsel and signed, did not bind the government, the Probation Department, or the Court to the lower Guidelines estimate in the plea agreement that erroneously omitted this enhancement. As an initial matter, the language of the plea agreement makes this fact quite clear, stating: "The Guidelines estimate set forth in [the plea agreement] is not binding on the [government], the

4

Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement." For the defendant to claim that the language of the plea agreement constitutes "gamesmanship" and "a trap for the unwary" that "runs afoul of the government's obligations of transparency and fair dealing" is entirely specious, given that the plea agreement explicitly addresses the exact circumstances that are at issue here in clear terms. Nor is there anything untoward in a plea agreement provision that provides that a defendant stipulates to a Guidelines calculation, particularly in a case, such as here, where such a stipulation ensures that key facts, such as the defendant's use of a firearm or the weight of the purported heroin, are resolved at the time of plea, rather than being disputed at an evidentiary hearing pursuant to United States v. Fatico, 579 F.2d 707 (2d Cir. 1977). Indeed, in a case such as this, where the defendant was charged with engaging in multiple other serious crimes (some of which carried with them significant mandatory minimum sentences) to which he did not plead, his willingness to stipulate to the applicability of the various Guidelines enhancements set forth in the plea agreement is a critical factor in the government's decision to extend a plea agreement allowing the defendant to plead guilty to crimes that carry no mandatory minimum. The defendant's insinuation that something is amiss here is entirely without merit.

III. Analysis

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

"[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

IV. Discussion

The government respectfully submits that the Court should impose a significant incarceratory sentence that is appropriate to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Such a sentence will both provide appropriate punishment for the "nature and circumstances of the offense" as well as further the aims of specific and general deterrence. See id. §§ 3553(a)(1), (a)(2)(B) & (a)(2)(C).



B.  Nature and Circumstances of the Offense, Respect for the Law and Just Punishment

The nature and circumstances of the defendant's offenses are extremely serious. Over the course of years, the defendant accepted tens of thousands of dollars in bribes, while employed as an NYPD officer and charged with upholding the law, to engage in multiple corrupt schemes, including schemes that divulged private information entrusted to the NYPD by automobile accident victims in exchange for profit and, with respect to the Tow Truck Scheme, jeopardized public safety. Specifically, law enforcement learned from numerous sources during the investigation that absent DARP rules, or when DARP is not followed, tow-truck drivers monitor police radio scanners and race to the scenes of local accidents, resulting in unsafe driving that often results in serious injury. Even more alarming was the defendant's repeatedly expressed desire to engage in more serious criminal conduct upon his retirement from the NYPD, including his eventual attempt to transport a kilogram of heroin for a drug trafficking organization while armed with a gun and carrying his retired NYPD credentials.[1]

The defendant's conduct also deeply undermined the public's trust in the integrity of its law enforcement officers at a time in which the public's confidence in the police is particularly vulnerable. See Aimee Ortiz, "Confidence in Police Is at Record Low, Gallup Survey Finds," Aug. 12, 2020, N.Y. Times, available at https://www.nytimes.com/2020/08/12/us/gallup-poll-police.html. Without trust in the fair, evenhanded and uncorruptible pursuit of justice, the rule of law disintegrates. "The democratic acceptance of . . . effective but proportionate law enforcement [is among] the building blocks of trust and the single most important antidote against

---

[1] The defendant insinuates in his sentencing submission that his eventual agreement to transport heroin for a drug trafficking organization while armed with a gun was the result of prodding and encouragement by the government, essentially a thinly veiled claim of entrapment. However, such an argument is entirely without merit. The evidence in this case, as reflected in the statement of facts in the PSR which the defendant does not contest, reflects that the defendant repeatedly and enthusiastically solicited Individual No. 1, who he understood to be involved in organized crime, to introduce the defendant to other criminal associates so that the defendant could commit new crimes upon his retirement. When Individual No. 1 agreed to introduce the defendant to his criminal associates but did not immediately do so, the defendant expressed displeasure and prodded Individual No. 1 to hold up "his end of the deal." And, after several months had passed, when Individual No. 1 finally arranged the introduction, the defendant thanked Individual No. 1 and confirmed that the meeting was "exactly what I was looking for." The defendant cannot now recharacterize himself as a reluctant participant in the armed drug trafficking scheme, when his conduct at the time speaks clearly otherwise.

7

the violent expression of dissatisfaction, greed, and lust for power at the expense of other human beings." Ernst M.H. Hirsch Ballin, "Keynote Address," 110 Am. Soc'y Int'l L. Proc. 347, 349 (2016). When the law is administered even-handedly, citizens can proceed in their lives assured that they will be provided their just desserts. When law enforcement authorities trusted with enforcing the rules exhibit favoritism, corruption and greed, the governed community has no reason to trust the system.

There can be no question that the defendant knew what he was doing was seriously wrong. Indeed, in numerous recordings obtained by the government during the course of its investigation, the defendant was repeatedly recorded referring to himself in criminal terms as, for example, "one of the most corrupt cops in the 105," a "perp[] that got away," and someone who, if he had not been an NYPD officer, would have been "locked up so many times." The defendant engaged in these various criminal schemes over the course of many months and exhibited a desire to escalate his criminal involvement upon his retirement.

Because this crime was serious and undermines the public's trust in the integrity of the law enforcement community of which the defendant was ostensibly a proud member, the just punishment for the offense must restore the public's faith in the evenhanded administration of justice, and must demonstrate that nobody is above the law.

C. History and Characteristics of the Defendant

The history and characteristics of the defendant also justify a significant incarceratory sentence. See 18 U.S.C. § 3553(a)(1). Whatever positive contributions to society the defendant may have made, these do not mitigate the criminal acts he committed while serving as a law enforcement officer. Indeed, far from being an exemplary police officer, the defendant failed in his most basic duties as a law enforcement officer—to himself obey the law and to investigate and report crimes of which he became aware. Rather than arrest Individual No. 1 upon learning of his attempts to bribe the defendant and Hassett in 2016, he joined him as a cop turned criminal and then even recruited other NYPD officers, such as Busch, into the fold.

V. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a significant incarceratory sentence that is sufficient, but not greater than necessary to achieve the goals of sentencing.

Respectfully submitted,

BREON PEACE
United States Attorney

By: /s/
Ryan C. Harris
Nicholas J. Moscow
Assistant U.S. Attorneys
718-254-7000

cc: Clerk of the Court (RPK) (by ECF)
Andrew Frisch, Esq. (Counsel to the defendant) (by ECF and e-mail)
Jameka Bing, United States Probation Officer (by e-mail)